**SOUTHWESTERN INVESTMENT COM-
PANY, Appellant,**

**v.**

**The AMERICAN NATIONAL BANK OF
AMARILLO, Appellee.**

No. 7304.

Court of Civil Appeals of Texas.

Amarillo.

Dec. 9, 1963.

Rehearing Denied Jan. 6, 1964.

Clayton, Martin & Harris, Amarillo, for appellant.

Culton, Morgan, Britain & White, Amarillo, for appellee.

DENTON, Chief Justice.

This case involves the superiority of liens on fifteen used automobiles. The liens asserted by appellant, Southwestern Investment Company, are claimed under the Trust Receipts Act, Article 5499a–51, Vernon's Ann.Tex.St.; and the asserted liens of appellee. The American National Bank of Amarillo, are claimed under the Certificate of Title Act, Article 1436–1, Vernon's Ann. P.C. Plaintiff below, Southwestern Investment Company, brought this action against Ruel Nichols and the appellee bank to declare the investment company's liens superior and for foreclosure of such liens. The bank's answer and cross-action sought substantially the same relief. The case was tried before a jury, however upon the conclusion of the evidence, it was agreed in open court by the parties hereto that there was no disputed issue of fact, and the case was submitted to the court without the intervention of a jury. The trial court rendered judgment in favor of the bank against both Nichols and appellant and in favor of the appellant against Nichols. Only the appellant investment company has appealed.

The evidence material to the determination of this case is undisputed. In December of 1958 Nichols became engaged in the sale of new and used cars. Soon thereafter he established a line of credit with the appellant investment company whereby ap-

pellant floor planned or financed Nichols purchase of cars to be resold. In order to facilitate the financing, Nichols signed a "Signature Authorization" which authorized an officer or employee of the investment company to sign notes, chattel mortgages, etc. for Nichols. They carried out this floor plan arrangement until Article 5499a–51, referred to as "Uniform Trust Receipts Act", became effective on January 1, 1960. On January 4, 1960, Nichols entered into a trust receipt financing agreement with appellant and the same was filed with the Secretary of State in accordance with the Act. The record reflects the appellant filed annual trust receipts statements during the period material here. It is undisputed that throughout the period of dealing with Nichols appellant did not retain the certificates of title to the automobiles they financed for Nichols, nor were their liens noted on the titles. Nichols took possession of the certificates of title along with the automobiles being financed by the investment company. Appellant's employees did make periodic inspections of the cars on Nichols' lot but they did not call for nor inspect the certificates of title.

Following the enactment of the Trust Receipts Act, Nichols borrowed money from both the appellant investment company and the appellee bank. Beginning on August 30, 1960, Nichols borrowed money from the appellee bank for the purported purchase of these fifteen cars, after he had previously floor planned the same cars with appellant. At the time each of these cars was financed at the bank, clear certificates of title to the cars were turned over to the bank and retained by it. During one of its periodic inspections on March 16, 1961, the investment company's employee discovered Nichols had sold several of the cars "out of trust", and then learned for the first time that loans were being made to Nichols by the bank. The investment company then took possession of the cars. The bank refused to surrender the certificates of title and the finance company refused to surrender possession of the cars. Subsequent to appellant's filing of this suit on April 6, 1961, the bank prepared applications for new certificates of title on the cars on which they had made loans. These new certificates of title showed ownership in Nichols with liens in favor of the bank in the amount of the respective loans. Prior to the trial of the case, the parties agreed that the cars involved would be sold and the proceeds of such sale were placed in the registry of the trial court. Nichols has been declared bankrupt and is not before the Court on this appeal.

The ultimate question to be decided is the superiority of the liens held by the respective parties. All cars involved were used cars as distinguished from new cars. The finance company contends its liens, established under the Trust Receipts Act, are superior and argues that once it complied with this Act its liens were established and they were under no duty or obligation to comply with the Certificate of Title Act. Appellant further takes the position that the two acts are in conflict and that the Trust Receipts Act, being the most recent, supersedes the Certificate of Title Act. The bank's contention is that inasmuch as it retained the clear negotiable certificates of title in its possession in good faith and for value without notice of the investment company's interest, its liens were thereby established and as such are superior to any liens that might have been acquired by appellant. It is undisputed that neither party had notice of the others dealings with Nichols.

A determination of the case requires an interpretation of the Trust Receipts Act. Before proceeding, we are constrained to quote with complete approval Judge Patrosso's description of the Trust Receipts Act in Citizens Nat. Trust & Savings Bank of Los Angeles v. Beverly Finance Co., 127 Cal.App.2d Supp. 835, 273 P.2d 714:

"* * * the statute is far from a model of perspicuity and its nebulous language, unless carefully read and an-

alyzed, is readily susceptible to erroneous inferences."

Under the terms of Section 7 of the Act, the investment company, as entruster, who has filed with the Secretary of State as required by the Act—as was done by the appellant—preserves "his security interest in documents or goods against all persons, save as otherwise provided by Sections 8, 9, 10, 11, 14, and 15 of this Act." In this case if any exception to the security preserved by the entruster does exist, it falls within Section 9(1) of the Act. The material portions of that act which is headed "Limitations on Entruster's Protection Against Purchasers" reads as follows:

"Sec. 9. 1. Purchasers of Negotiable Documents or Instruments.

"(a) Nothing in this Act shall limit the rights of purchasers in good faith and for value from the trustee of negotiable instruments or negotiable documents, and purchasers taking from the trustee for value, in good faith, and by transfer in the customary manner instruments in such form as are by common practice purchased and sold as if negotiable, shall hold such instruments free of the entruster's interest; and filing under this Act shall not be deemed to constitute notice of the entruster's interest to purchasers in good faith and for value of such documents or instruments, other than transferees in bulk.

"(b) The entrusting (directly, by agent, or through the intervention of a third person) of goods, documents or instruments by an entruster to a trustee, under a trust receipt transaction or a transaction falling within Section 3 of this Act, shall be equivalent to the like entrusting of any documents or instruments which the trustee may procure in substitution, or which represent the same goods or instruments or the proceeds thereof, and which the trustee negotiates to a purchaser in good faith and for value."

■ Section 1 of the Act defines "Document" as "any documents of title to goods." The section also defines "purchaser" as "any person taking by purchase. A pledgee, mortgagee or other claimant of a security interest created by contract is, insofar as concerns his specific security, a purchaser and not a creditor." "Value" is defined as "any consideration sufficient to support a simple contract." Nichols is the "trustee" under this Act.

■ Upon the payment of each draft drawn by Nichols on the appellee bank to purchase each of the fifteen cars, the bank was a payee of a promissory note signed by Nichols, and in addition received a "clear" certificate of title to the car as security. Thus, it is clear the bank, as mortgagee, became a purchaser for value under the definition set out in the Act.

■ The question which then presents itself is whether the certificates of title acquired by the bank when it floor planned the cars for Nichols were "negotiable documents" under the terms of the Trust Receipts Act. Under Section 9, subd. 1(b), although the original subject of the entrustment was "goods" rather than "instruments" or "documents", the entrustment should be deemed to encompass "any documents or instruments which the trustee may procure in substitution, or which represent the same goods * * * or the proceeds thereof, and which the trustee negotiates to a purchaser in good faith and for value." It seems clear that the certificates of title acquired by Nichols from the appellant investment company were procured by the trustee Nichols in substitution for or represents the same goods (the automobiles). Certificates of title to motor vehicles are prima facie proof of title to such vehicles. Commercial Credit Corp. v. Harris, Tex. Civ.App., 225 S.W.2d 247.

■ As stated above, the Trust Receipts Act defines "Document" as "any documents of title to goods." This latter phrase is not defined by the Act, but it

is defined by the Uniform Sales Act as follows:

> " 'Document of title to goods' includes any bill of lading, dock warrant, warehouse receipt or order for the delivery of goods, *or any other document used in the ordinary course of business in the sale or transfer of goods,* as proof of the possession or control of the goods, or authorizing or purporting to authorize the possessor of the document to transfer or receive, either by indorsement or by delivery, goods represented by such document." (Emphasis added)

Under this recognized definition, the certificates of title here involved clearly come within that definition. A certificate of title is necessary for the sale or transfer of a motor vehicle. To accomplish this an indorsement or assignment and delivery of the certificate of title is required. Indorsement and delivery are basic characteristics of a negotiable instrument. The Trust Receipts Act places emphasis on the accepted practice of negotiability rather than technical appearances of negotiability. The assignment and delivery of a clear, unencumbered certificate of title is the means whereby modern financing and sale of automobiles are carried on. We are of the opinion the certificates of title were negotiable documents within the meaning of the Trust Receipts Act. It is to be further noted the investment company's employees recognized the certificates of title as "clear, negotiable titles." Nichols was required to present these titles to the finance company before his drafts were accepted and paid. We conclude therefore that when the bank in good faith for value took these unencumbered certificates of title it became a purchaser of negotiable documents under the meaning of the Trust Receipts Act and that appellant's filing under the Trust Receipts Act did not constitute notice of the entruster's interest in the automobiles. The bank held these open titles in its possession even though its liens were not noted on the certificates. It has been held that a lender of money for the purchase of an automobile may protect himself by retaining the title papers in his possession or by causing a lien to be noted upon the papers. First State Bank of Corpus Christi v. Austin, (Tex.Civ.App.), 315 S.W.2d 390, (Error Refused). Associates Inv. Co. v. National City Bank of Waco, (Tex.Civ.App.), 231 S.W.2d 661. McKinney v. Croan, 144 Tex. 9, 188 S.W.2d 144. The bank chose to protect itself by retaining the certificate of title until the indebtedness on each car had been paid. Section 51 of the Certificates of Title Act makes it unlawful for any person to sell or offer for sale any motor vehicle without having the certificate of title thereto. Thus, by retaining the certificates of title, the bank effectively prevented Nichols from disposing of the cars or obtaining further financing until the bank's liens had been discharged. No such precaution was taken by the appellant investment company as it permitted Nichols to retain the clear certificates of title.

■ The practice of banks and finance companies to retain possession of clear "open title" as security for purchase money is so general as to be of general knowledge. To the same extent is the practice of automobile dealers to receive this "open title" when automobiles are purchased. In such instances the assignment of the certificate of title as signed by the owner does not contain the name of the purchaser. The name of the purchaser is inserted at the time the dealer sells the car. When the dealer sells the car, an application for a new title is made and the purchaser is listed as the owner. Neither the dealer in the used car nor the floor planning lender appears on the new title.

■ Contrary to appellant's contention, we do not think the Certificate of Title Act and the Trust Receipts Act are in conflict. In the first instance, the Certificate of Title Act is a specific act dealing only with motor vehicles and house trailers, while the Trust Receipts Act deals with "any chattels personal other than: money, things in action,

or things so affixed to land as to become a part thereof." The Certificate of Title Act recognizes the existence of "trust receipt liens" in Section 3 of the Act although undoubtedly it is making reference to the trust receipt known at common law. We therefore conclude the two acts are not in conflict and must be read together, and each given effect according to the facts and circumstances of the particular case. Both acts serve useful, unique purposes in present day commercial transactions.

The Texas Trust Receipts Act has not been previously interpreted by the Texas Courts. We must therefore look to other jurisdictions which have adopted similar acts. An excellent analysis of the material provisions which are identical with the sections under consideration here was made by the California court in Citizens Nat. Trust & Savings Bank of Los Angeles v. Beverly Finance Co., (Supra). The only material difference in that case and the case at bar is that the bank there purchased for value a conditional sales contract from the trustee as security for money loaned on the automobile rather than taking the certificate of title as security. The court held the bank was a purchaser in good faith and the instrument so purchased was in such form as by common practice was purchased and sold as if negotiable. The court concluded the rights of the bank were superior to those of the finance company, an entruster under the California Trust Receipts Act. See also General Credit Corp. v. First National Bank of Cody, 74 Wyo. 1, 283 P.2d 1009; and Dart National Bank v. Mid-States Corp., 356 Mich. 574, 97 N.W. 2d 98. As stated above, the only material distinctions between this case and the case at bar are the types of instruments involved. In view of the language of identical trust receipts act provisions, we do not think this distinction is of any consequence as both instruments are of such a nature as to come within the exception of Section 9, subd. 1(a) and (b) of the Act.

It is undisputed the appellee bank was acting in good faith and without notice of appellant's entruster interest in the automobiles and that the bank parted with value when it acquired the certificates of title. We therefore conclude the trial court correctly decided the liens of the bank were superior to those of the entruster, and as such the bank held such liens free of the entruster's interest.

The judgment of the trial court is affirmed.

Affirmed.